# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00433-COA

IN THE MATTER OF THE ESTATE OF LESTER          APPELLANTS
RANDLE, DECEASED: TUMIKA RANDLE
WEBBER AND SYLVESTER RANDLE

v.

DOROTHY MEEKS RANDLE                        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/24/2020 |
| TRIAL JUDGE: | HON. WATOSA MARSHALL SANDERS |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | CARLOS DIALLO PALMER |
| | TANGALA LANIECE HOLLIS |
| ATTORNEY FOR APPELLEE: | MARGARETTE LAFAYE MEEKS |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 10/26/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### EN BANC.

### BARNES, C.J., FOR THE COURT:

¶1.     Tumika Randle Webber[1] and Sylvester Randle (Appellants) appeal the Leflore County Chancery Court's ruling excluding them as heirs at law of Lester Randle's estate. Specifically, they claim that (I) the administrator of the estate, Dorothy Meeks Randle, was

---

[1] During the pendency of this appeal, a motion to supplement Appellee Dorothy Randle's responsive brief indicated that Tumika Randle Webber died in June 2021. In denying the Appellee's motion, we concluded, "The Court does not find that Dorothy's motion qualifies as a formal invocation of the procedures to substitute a party through a suggestion of death. M.R.A.P. 43(a)." Nor did we find that Tumika's death "'foreclose[d] our ability to grant the relief requested' through the current appeal," quoting *Timms v. Pearson*, 876 So. 2d 1083, 1084 n.1 (Miss. Ct. App. 2004).

estopped from challenging their paternity; (II) the chancery court erred in making the paternity determination without Lester's DNA; (III) the chancery court improperly shifted the burden to the Appellants to rebut the presumption of paternity; and (IV) the court erred in ordering the Appellants to post a supersedeas bond. We find no error in the chancery court's ruling that the Appellants are not Lester's heirs at law, but we reverse and render the court's order requiring the Appellants to post a supersedeas bond.

## FACTS AND PROCEDURAL HISTORY

¶2.     Lester died on July 14, 2009, and was survived by Dorothy, his wife of twenty-one years, and their son, Raymond Randle. Lester had previously been married to Ruthie Randle. Two children were born of that marriage: Tumika and Sylvester, the Appellants. Ruthie and Lester divorced in 1977 when the children were very young.

¶3.     Lester died intestate. On May 7, 2018, Dorothy filed a petition for grant of letters of administration in which she noted that Lester's "estate consist[ed] of no real property but ha[d] a potential claim for unliquidated damages arising out of" Lester's death. The petition acknowledged the Appellants, as well as Dorothy and Raymond, as Lester's heirs at law. Dorothy was appointed administrator on July 12, 2018.

¶4.     On November 19, 2018, Dorothy filed a petition for a determination of heirship, now asserting that the estate consisted of a claim for benefits against the manufacturer of Granuflow/Natural Lyte in the amount of $67,500.25 arising from Lester's use of the prescription drug. The petition further claimed that the Appellants were "*not* heirs at law of Lester Randle and [were] not entitled to any of the settlement proceeds," but rather they

2

"were born to a married man, putative father," and Ruthie. (Emphasis added). A summons by publication was submitted in the newspaper, *The Greenwood Commonwealth*, to any unknown heirs.

¶5. At a hearing before the chancery court on April 11, 2019, Cederica Gilliam appeared, claiming to be Lester's heir; so the court continued the proceedings and ordered Lester's putative children—Sylvester, Tumika, Cederica, and Raymond—to undergo DNA testing. A second hearing was held on January 13, 2020. The testifying witnesses were Brandi Jones (owner of Capital DNA), Dorothy, Cederica, and Cederica's brother Antonio Gilliam.

¶6. Jones presented the DNA results, which revealed that there was a 98.74% probability that Raymond and Cederica were half-siblings. There was a 99.69% probability that Tumika and Sylvester were "full siblings." However, the probability that Raymond and Tumika were unrelated was 93.51%. Between Raymond and Sylvester, the report indicated that the "state of the relationship is inconclusive because the probabilities of each are less than 91%." It was further determined there was more than a 99% probability that Cederica and Tumika (99.94%)/Sylvester (99.45%) were unrelated. Thus, Jones testified that based on the reports, "only one individual is a half sibling of Raymond Randle. That is [Cederica]." She also testified that the results showed the Appellants were full siblings, which meant they had "the same mother and the same father." The parties stipulated to the DNA results being entered into evidence.

¶7. In her testimony, Dorothy acknowledged that Lester was listed as the father on the Appellants' birth certificates and that he had been ordered to pay their child support.

3

Dorothy also said, however, that she was "aware of Lester seeking out legal help to look into whether the children were his because he did question it. But at the time they told him it was no good because he was married to [Ruthie]." Dorothy admitted that Lester never instituted any legal proceedings to challenge paternity of the Appellants.

¶8. Both Cederica and his brother Antonio testified that their mother had informed them Lester was Cederica's father. Cederica admitted that there was no one listed as his father on his birth certificate, but he stated that Lester would "randomly" stop by and ask him if he needed anything. Cederica would also stop and talk with Lester if he saw him outside on his porch. Cederica assumed Dorothy knew about him, "but eventually [sic] she didn't."

¶9. On January 24, 2020, the chancery court entered its final order. The court determined Cederica was Lester's biological child and Raymond's half-sibling, but his claim was statutorily time-barred under Mississippi Code Annotated section 91-1-15(3) (Rev. 2018).[2] The chancery court further concluded that the Appellants were not Lester's legal heirs at law based on the cross-referencing of the DNA results. Accordingly, the court adjudged Dorothy and Raymond as Lester's only heirs at law and awarded them equal shares in any distribution of property. The court also ordered that the Appellants could, at their own expense, exhume

---

[2] Section 91-1-15(3) provides in pertinent part:

[N]o such claim of inheritance shall be recognized unless the action seeking an adjudication of paternity is filed within one (1) year after the death of the intestate or within ninety (90) days after the first publication of notice to creditors to present their claims, whichever is less; and such time period shall run notwithstanding the minority of a child.

Cederica has not challenged the court's ruling.

4

Lester's body for DNA testing within thirty days from January 13, 2020, if they wished to do so.

¶10. The Appellants filed a motion for finding of facts and law under Rule 52 of the Mississippi Rules of Civil Procedure. They also filed a motion for a new trial, amendment of judgment, or relief from the judgment or order. In the motion, they alleged that because Lester had never disestablished their paternity or terminated his child-support obligation, he "remained the legal father of Tumika Randle Webber and Sylvester Randle[.]" The Appellants further asserted that the chancery court's allowing them to exhume Lester's body for DNA testing *at their expense* was "not equitable under the circumstances[,] . . . contrary to the present status of the law," and improperly shifted the burden of establishing paternity to them. On March 31, 2020, the chancery court denied the motion for a new trial or to amend the judgment, finding the Appellants had failed to establish any basis for relief under either Rule 59 or Rule 60 of the Mississippi Rules of Civil Procedure.

¶11. The court subsequently filed an order to approve the distribution of assets and to close the estate on April 17, 2020. The Appellants filed a motion to set aside that order. The following day, they also filed a notice of appeal and a motion to stay the execution of the order. The Appellants later withdrew the motion to stay at a May 1, 2020 motions hearing; so the chancery court dismissed that motion and ordered both Appellants to post a $5,000 supersedeas bond pending the appeal.

**STANDARD OF REVIEW**

¶12. "This Court employs a limited standard of review on appeals from the chancery

5

court," affording the court "great deference" in its findings of fact. *Russell v. Allen*, 962 So. 2d 737, 741 (¶14) (Miss. Ct. App. 2007). The chancery court is "vested with broad discretion, and this Court will not disturb [its] findings unless the court's actions were manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard." *Smith v. Hunter (In re Est. of Hunter)*, 736 So. 2d 440, 443 (¶9) (Miss. Ct. App. 1999).

## DISCUSSION

**I.** **Whether the chancery court erred in excluding the Appellants as Lester's heirs at law.**

¶13. In claiming the chancery court erred in ruling the Appellants are not Lester's heirs at law, the Appellants argue that Dorothy was estopped from challenging their paternity by the doctrines of unclean hands, equitable estoppel and judicial estoppel, and because Lester never sought to disestablish paternity before he died. They also contend that the chancery court erred in excluding evidence of their paternity because of the DNA evidence, noting that Lester was listed as their legal father on their birth certificates.

> *A.* *Doctrines of Unclean Hands, Equitable Estoppel, and Judicial Estoppel*

¶14. As cited by the Appellants, the Mississippi Supreme Court has held:

The doctrine of unclean hands provides that "he who comes into equity must come with clean hands." *Thigpen v. Kennedy*, 238 So. 2d 744, 746 (Miss. 1970). In *O'Neill v. O'Neill*, 551 So. 2d 228, 233 (Miss. 1989), this Court further expounded upon the meaning of unclean hands, stating: "[t]he meaning of this maxim is to declare that no person as a complaining party can have the aid of a court of equity when his conduct with respect to the transaction in question has been characterized by wilful inequity. . . ." The Court in *Brennan v. Brennan*, 605 So. 2d 749, 752 (Miss. 1992), held that "[t]he maxim should

6

be applied by the court sua sponte where it is shown to be applicable." *See also Estate of Van Ryan v. McMurtray*, 505 So. 2d 1015, 1019 (Miss. 1987) ("[T]his Court has held that when it is evident by the facts of the case that the unclean hands doctrine is applicable, the chancellor has a duty to apply that doctrine of its own motion.").

*In re Est. of Richardson*, 903 So. 2d 51, 55 (¶15) (Miss. 2005). In *Richardson*, the supreme court found the doctrine of unclean hands prohibited an administrator from petitioning to disinherit certain heirs at law of the decedent after she had already "filed numerous sworn pleadings" declaring them to be the decedent's heirs. *Id*. at 53-55 (¶¶7-15). The Appellants likewise claim that when Dorothy filed the petition to grant letters of administration, she expressed no doubt "as to the heirship and/or paternity of Appellants." They contend that it was only when Dorothy discovered that the estate was worth $67,500.25 that she changed her formerly "sworn-to position" regarding the Appellants' status as heirs. Thus, the Appellants argue that Dorothy's actions "were not done in good faith" and were "a violation of the clean hands doctrine[.]"

¶15. Unlike the administrator in *Richardson*, however, Dorothy filed only one sworn petition identifying the Appellants as Lester's heirs at law, not "numerous sworn pleadings." Also, the trial court in *Richardson* had already entered an order adjudging the heirs and directing the administrator "to distribute the proceeds" prior to the administrator's filing of the petition for determination of heirship. *Id*. at 54 (¶9). Here, the court had yet to issue any order in that regard.

¶16. Moreover, as the chancery court noted in its March 2020 order, "while the [a]dministrat[or] of an estate might be prohibited from bringing a paternity action regarding

7

a child in question, she is not prohibited from contesting the paternity of someone claiming to be an heir." Thus, the court determined that Dorothy "had an obligation and a duty to contest [the Appellants'] paternity in good faith as [a]dminstrat[or] of this estate[.]" *See In re Est. of Ivy*, 121 So. 3d 226, 243 (¶84) (Miss. Ct. App. 2012) (recognizing that "[a]n administrator of an estate has both the standing and the duty to file a petition to determine heirs"); *In re Est. of Stowers*, 678 So. 2d 660, 662 (Miss. 1996) (explaining that an administrator has "a duty . . . to protect the assets of the estate"). We find Dorothy was not barred by the doctrine of unclean hands from challenging the Appellants' paternity.

¶17. We also find no merit to the Appellants' claims of equitable and judicial estoppel. "Equitable estoppel precludes a party from denying a material fact[,] which he has previously induced another to rely upon, whereby *the second party* changed his position in such a way that he would suffer injury if denial was allowed." *Christian Methodist Episcopal Church v. S & S Const. Co.*, 615 So. 2d 568, 571 (Miss. 1993) (emphasis added). The party asserting estoppel bears "[t]he burden of establishing the elements of an estoppel . . . by the preponderance of the evidence." *Chance v. Chance*, 191 So. 3d 1293, 1299 (¶21) (Miss. Ct. App. 2016). The Appellants, the "second party" in this instance, have not demonstrated that *they* were "induced" to change *their* position; rather their claim is that Dorothy changed her position after learning of the settlement money. Therefore, they have not met their "burden of establishing" equitable estoppel.

¶18. Nor do we find Dorothy was estopped under the doctrine of judicial estoppel, which "precludes a party from asserting a position, benefitting from that position, and then, when

it becomes more convenient or profitable, retreating from that position later in the litigation." *Clark v. Neese*, 131 So. 3d 556, 560 (¶15) (Miss. 2013). The Appellants have not established how Dorothy, who was not yet appointed administrator at the time, gained any benefit from listing the Appellants as putative heirs at law in the first petition. *See Gibson v. Williams, Williams & Montgomery P.A.*, 186 So. 3d 836, 846 (¶25) (Miss. 2016) ("When the party asserting the prior inconsistent position has not benefitted by the assertion, the doctrine should not be applied.") Once Dorothy became the estate's administrator, she then had standing and a duty to determine the heirs. This argument is without merit.

### B. Decedent's Failure to Disestablish Paternity Before His Death

¶19. It is undisputed that Lester's name was on the Appellants' birth certificates. Dorothy also acknowledged that Lester had paid court-ordered child support for Tumika and Sylvester. Dorothy testified that "[w]hen [Lester] went to contest [paternity], they would not listen" because he was married to Ruthie.[3] Thus, the chancery court noted, the evidence showed Lester sought "legal advice regarding disestablishing their paternity, but was informed by an attorney that this was not possible."

¶20. The Appellants argue that it was Lester's responsibility, as their "legal father," to disestablish paternity, and his failure to take any affirmative action to disestablish paternity estopped Dorothy from challenging it in the petition. To support this argument, the Appellants cite Mississippi Code Annotated section 93-9-10 (Rev. 2018), which provides in

---

[3] Although the separate opinion finds that Dorothy's testimony is "hearsay," the transcript indicates that this testimony was elicited on cross-examination with no objection or motion to strike.

part, "To disestablish paternity and terminate a child support obligation, the *legal father* must file a petition in the court having jurisdiction over the child support obligation." Miss. Code Ann. § 93-9-10(1) (emphasis added). Subsection (3) of the statute goes on to provide:

> [A] court shall not set aside the paternity determination or child support order if the legal father . . .
>
> > (b) Consented to be named as the biological father *on the child's birth certificate* and signed the birth certificate application or executed a simple acknowledgment of paternity and failed to withdraw consent or acknowledgment within the time provided for by law in Sections 93-9-9 and 93-9-28, unless he can prove fraud, duress or material mistake of fact;
> >
> > . . . .
> >
> > (e) Been named as the legal father *or ordered to pay support by valid order of the court* after having declined genetic testing[.]

*Id*. § 93-9-10(3) (emphasis added). Section 93-9-10, however, was not enacted until 2011, two years after Lester's death and years after Tumika and Sylvester turned twenty-one (when Lester's support obligation would have ended).[4] Thus, we find no merit to the Appellants' argument.

¶21. The separate opinion by Presiding Judge Carlton asserts that Mississippi Code Annotated section 93-9-21 (Rev. 1994) also provided Lester "an avenue" to challenge his paternity; so "Dorothy cannot now posthumously challenge or disestablish paternity." That version of the statute provided, "The court, on its own motion or upon motion of the plaintiff

---

[4] The statute only addresses "circumstances under which a legal father may disestablish paternity and terminate a child support obligation." Subsection (5) of the statute specifically provides that relief granted under the statute "*is limited to the issues of prospective child support payments, past-due child support payments, termination of parental rights, custody, and visitation privileges. . . .*" *Id*. § 93-9-10(5) (emphasis added).

10

or defendant, shall order the mother, the alleged father and the child or children to submit to blood tests and any other tests which reasonably prove or disprove the probability of paternity." Miss. Code Ann. § 93-9-21(1) (Rev. 1994). Reviewing the "Mississippi Uniform Law on Paternity," we disagree with the separate opinion's reasoning. Prior to 1994, Mississippi Code Annotated section 93-9-9 (Supp. 1993) provided, "Paternity may be determined upon the petition of the mother, the child, or any public authority chargeable by law with the support of the child[.]" It was not until 1994 that the statute was amended to provide that paternity proceedings might be initiated by a "father." Miss. Code Ann. § 93-9-9(1) (Rev. 1994) & amend. note. At that time, however, Tumika was twenty years of age, and Sylvester was eighteen. As the statute further provides, paternity proceedings "shall not be instituted after the child has reached the age of eighteen (18) years." *Id*. (Supp. 1993 & Rev. 1994).[5] Thus, by the time Lester could have instituted proceedings under this chapter, his children were already too old for him to do so.

¶22.    Moreover, our supreme court has expressly held that an administrator may contest paternity on behalf of a decedent. In *Stowers*, 678 So. 2d at 662, the supreme court found that "[u]nder the operation of [section] 93-9-21[,]" and its holding "in *Ivy v. Harrington*, 644 So. 2d 1218 (Miss. 1994),"[6] an administrator has "the concomitant duties to contest all claims

---

[5] As we recognized in *Autrey v. Parson*, 864 So. 2d 294, 296 (¶7) (Miss. Ct. App. 2003), section 93-9-9's "limitation on when an action for paternity can be brought is for the sole purpose of enforcing the defaulting putative parent's obligation to pay child support."

[6] In *Ivy*, a putative father sought to establish paternity of two children born of a marriage between the mother and her husband. *Ivy*, 644 So. 2d at 1219. The supreme court held that under section 93-9-21, the court "must order blood tests if requested by any party to a paternity action." *Id*. at 1223.

against the estate that may properly and in good faith, be contested." Likewise, we find that Dorothy was "obligated to contest paternity as the one in the shoes of the descendant [sic]" and "under a duty to use reasonable diligence to ascertain potential heirs and to file the names of such heirs in the final account." *See Stowers*, 678 So. 2d at 662; *see also* Miss. Code Ann. § 91-7-293 (Rev. 2018) (requiring administrator to file with final account "a written statement, under oath, of the names of the heirs or devisees and legatees of the estate").

¶23.    Although it is presumed that a child born of the marriage is legitimate, this presumption is rebuttable. *Smith v. Bell*, 876 So. 2d 1087, 1091 (¶13) (Miss. Ct. App. 2004). With regard to an illegitimate child in the case of an adjudication of paternity after the death of the intestate, paternity must be established "upon clear and convincing evidence, in an heirship proceeding under Sections 91-1-27 and 91-1-29." Miss. Code Ann. § 91-1-15(3)(c) (Rev. 2018); *see also Kendrick v. Gordon (In re Est. of Kendrick)*, 46 So. 3d 386, 390 (¶15) (Miss. Ct. App. 2010) ("Where the putative father is deceased at the time of an action to establish paternity, the claimant must offer clear and convincing proof of paternity.").

¶24.    Here, we are addressing an entirely different situation, as it is presumed that Tumika and Sylvester are Lester's children because they were children born of the marriage between Lester and Ruthie. "The presumption of legitimacy is one of the strongest known to our law." *Greer v. Greer*, 312 So. 3d 414, 416 (¶13) (Miss. Ct. App. 2021). Dorothy bore the burden to rebut that presumption. She could "prevail" in challenging the Appellants' legitimacy if she "prove[d] beyond a reasonable doubt" that Lester, Ruthie's legal husband

12

at the time of the children's birth, "is not, in fact, the biological father." *Smith*, 876 So. 2d at 1091 (¶13). Although the chancery court made no express determination that Dorothy had proved "beyond a reasonable doubt" that the Appellants were not Lester's biological children, the court clearly found that Dorothy had met her burden to rebut the presumption of legitimacy. The evidence showed, as determined by the court, that Dorothy met this burden through the DNA evidence presented, "prov[ing] that Tumika and Sylvester are not related to either of the two children that Lester Randle did acknowledge (Raymond and Cederica)."

> C.    *Chancery Court's Reliance on DNA Testing to Disestablish Paternity*

¶25.    This leads us to the Appellants' claim that the chancery court erred in relying on the DNA results in excluding them as heirs at law. We find no merit to this argument. The Mississippi Supreme Court has held that "DNA test results may rebut the presumption of legitimacy." *Est. of Smith v. Smith ex rel. Rollins*, 130 So. 3d 508, 513 (¶15) (Miss. 2014) (quoting *Rafferty v. Perkins*, 757 So. 2d 992, 995 (¶10) (Miss. 2000)); *cf. Chisolm v. Eakes*, 573 So. 2d 764, 767 (Miss. 1990) ("The general rule appears to be that [DNA] test results, properly authenticated and supported by other evidence, are admissible as evidence of paternity, but are not necessarily conclusive."). Mississippi Code Annotated section 93-9-27(1) (Rev. 2018) of the Uniform Law on Paternity states, "If the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly."

¶26.   Here, the parties stipulated to the DNA results being entered as evidence.  Although the owner of the DNA testing company acknowledged that she was not an "expert in the actual analysis of the specimen," the court did allow her to testify on a "limited basis" regarding her collection of the samples and "the interpretation of the results," as indicated by the reports.  She thereby testified that the reports revealed there was a high probability that Tumika (93.51%) and Sylvester (less than 91%) were unrelated to Raymond.  The probability they were unrelated to Cederica was over 99%.  As the court reasoned, if it were to accept the Appellants' argument that they could be Lester's biological children, the court "would also have to accept that both the mother of Raymond Randle and the mother of Cederica Gilliam had a child by the same man, who was not Lester Randle," as the tests showed a 98.74% probability that Raymond and Cederica were half-siblings.  Affording the chancery court "great deference" in its findings, we cannot find its ruling to exclude the Appellants as heirs at law based on this evidence to be manifestly wrong in this instance.

II.     **Whether the chancery court erred in not ordering a DNA sample from the deceased.**

¶27.   The Appellants argue that the absence of Lester's DNA made "any paternity conclusion speculative, at best and falls miserably short of beyond a reasonable doubt." Addressing this argument in the order denying the motion to amend the judgment, the chancery court reasoned that it had afforded the Appellants an opportunity to rebut the DNA evidence by exhuming Lester's body at their own expense to obtain his DNA sample.  They failed to avail themselves of this opportunity.

¶28.    To support this argument, the Appellants cite Mississippi Code Annotated section 93-

14

9-21(2) (Supp. 2020), which provides:

> In any case in which paternity has not been established, the court, on its own motion or on motion of the plaintiff or the defendant, shall order the mother, *the alleged father* and the child or children to submit to genetic tests and any other tests which reasonably prove or disprove the probability of paternity.

(Emphasis added). As this Court has held, however:

> [W]e are unable to find[] any case in which Section 93-9-21(1) has been applied to a case of descent and distribution. There is no applicable statutory provision or judicial decision mandating or even suggesting the necessity of blood testing or DNA evidence in cases of descent among illegitimates.

*Jordan v. Baggett*, 791 So. 2d 308, 311 (¶15) (Miss. Ct. App. 2001).

¶29. Under the circumstances, we find the chancery court acted within its discretion by concluding that the cross-referencing of the children's DNA was sufficient to make the paternity determination and that a sua sponte order requiring the exhumation of Lester's body for testing was not warranted. *See Will of Janis*, 600 N.Y.S.2d 416, 418-19 (N.Y. Sur. 1993) ("Where court intervention is necessary, exhumation rests within the court's sound discretion based upon the facts and circumstances of each case."); *Stastny v. Tachovsky*, 132 N.W.2d 317, 325 (Neb. 1964) (recognizing that "[t]he exhumation of a corpse, often a material assistance in insurance or inheritance cases, is demandable on this principle, *subject of course to the trial court's discretion as to necessity and propriety*") (emphasis added)); *but see Brown v. Jackson (In re Est. of Chambers)*, 711 So. 2d 878, 882 (¶13) (Miss. 1998) (holding chancellor "shall order" exhumation of deceased for paternity determination "[i]f it is necessary . . . [to] positively determine whether or not he is the father") (emphasis added)).

>    III.    **Whether the chancery court's order allowing the Appellants to exhume the deceased's body for DNA testing improperly shifted**

15

**the burden of proof.**

¶30.    As discussed, although they dispute that there was any question of their paternity, the Appellants contend that under section 93-9-21, the court should have ordered DNA testing of the deceased, a contention we have found to be without merit.  The Appellants further claim that the chancery court's order allowing them to exhume Lester's body *at their expense* was "not equitable under the circumstances and [was] contrary to the present status of the law."  By ordering them to bear that cost, they argue that the court improperly shifted the burden of establishing paternity to them and that the burden "should be rightfully placed on the party that created the issue of paternity."  The chancery court rejected this argument, reasoning that once Dorothy rebutted the presumption of paternity, "it then became the responsibility of Tumika and Sylvester to prove that the evidence used to rebut the presumption was flawed."

¶31.    Rule 301 of the Mississippi Rules of Evidence provides:

> In a civil case, unless a Mississippi statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.

Rule 301 notwithstanding, we do not find that the court's "accommodation," as the Appellants term it, was an improper shift of the burden of persuasion in this instance.  There was a presumption that they were children born of the marriage.  As the court found, Dorothy rebutted the presumption through the evidence presented.  The Appellants presented no evidence to refute Dorothy's evidence.  Finally, it was the Appellants who requested that Lester's body be exhumed for genetic testing, and the chancery court allowed them to do so.

We find no merit to this claim.

**IV. Whether the chancery court erred in ordering the Appellants to post a supersedeas bond.**

¶32. On April 20, 2020, the Appellants filed a motion to set aside the judgment. A day later, they filed a motion to stay execution of the court's order and a notice of appeal. Dorothy filed a response asking that the Appellants' motion to stay be denied. She further requested that she be "award[ed] her attorneys fees in th[e] matter," noting that monies for attorney's fees and expenses had already been disbursed and were being held in her attorney's trust account pending the appeal.

¶33. A hearing was held on May 1, wherein counsel for the Appellants informed the court that they did "not wish to go forward" with their motion to stay execution of the order closing the estate but still wished to go forward with the motion to set aside the order. Arguing in support of the motion to set aside the order, counsel for the Appellants noted the order's "specific language as far as authorizing the administratrix to close the estate, as well as to make distributions of the assets of that estate for attorneys' fees, both Ms. Randle, as well as her son." Counsel further opined that had the estate's funds "been expended on attorneys' fees and/or distributed in whole or in part" before the Appellants had an opportunity to appeal the judgment, "that would have deprived our clients' opportunity to be able to take of those particular assets, presuming . . . they were successful on their appeal[.]"

¶34. Addressing these arguments, the chancery court ruled at the hearing, "[S]ince th[e] Notice of Appeal does act as a supersedeas as to stay the execution of anything else, including the distribution of these assets, this [c]ourt is going to require a supersedeas bond

17

be posted." The court further noted that if the Appellants' motion to set aside the order closing the estate were granted, "then the distributions of the assets would be set aside too because that [o]rder allowed the distributions of assets. So we would still require a supersedeas bond." The Appellants' counsel argued that a supersedeas bond was not "proper" because their notice of appeal "would supersede any motions" (i.e., the motion to stay and motion to set aside the order) and because there was no money judgment, noting that this was simply a "general appeal of an [o]rder determining heirs of an estate." Counsel also contended that requiring a supersedeas bond would "put[] an unnecessary hardship on [the Appellants] and their right to pursue an appeal."

¶35. The chancery court nevertheless ordered that a supersedeas bond be posted, reasoning:

> The law requires that they post a supersedeas bond to at least secure the attorney fees in a nonmonetary [j]udgment. If that was not the case, then anybody who is upset with a [j]udgment could automatically just go in and file an appeal just to be arbitrary. And once the estate has incurred additional fees and attorney fees and costs, not to mention waiting a year for their money, the appellate comes back and says, "Oh, well, too bad, so sad." It doesn't work that way.

The chancery court subsequently dismissed the motion to stay execution of the judgment on May 7, 2020, and on June 10, 2020, the court entered an order nunc pro tunc to May 1, 2020, requiring Tumika and Sylvester each post a $5,000 supersedeas bond.

¶36. Mississippi Rule of Appellate Procedure 8(b), which addresses stays pending appeal, provides:

> (1) Application for a stay of the judgment or the order of a trial court pending appeal or for approval or disapproval of a contested supersedeas bond or for an order suspending, modifying, restoring, or granting an injunction during the pendency of an appeal must ordinarily be made in the first instance to the trial

18

court. The court shall require the giving of security by the appellant in such form and in such sum as the court deems proper, and for good cause shown may set a supersedeas bond in an amount less than the 125 percent required in cases under Rule 8(a).

(2) However, a bond or equivalent security required on any money judgment entered in whole or in part on account of punitive damages shall, as to the punitive damages portion of the judgment only, be the lower of:

(a) 125 percent of the total amount of punitive damages, or

(b) ten percent of the net worth of the defendant seeking appeal as determined by applying generally accepted accounting principles to the defendant's financial status as of December 31, of the year prior to the entry of the judgment for punitive damages.

(c) Absent unusual circumstances, the total amount of the required bond or equivalent security for any case as to punitive damages shall not exceed $100,000,000.

The Appellants argue that "none of the instances outlined in M.R.A.P. 8(b) existed . . . to justify the trial court's setting a supersedeas bond as a condition of Appellants' appeal." Dorothy simply responds that "[t]he amount set in this case was lower than what the trial court could have set" and that the Appellant's appeal stayed the proceedings until resolution, "requiring the estate to be protected through said [s]upersedeas [b]ond."

¶37. We find that the chancery court's determination that the notice of appeal "act[ed] as a supersedeas as to stay the execution" of the judgment is incorrect. In *Moreland v. Riley (In re Est. of Moreland)*, 537 So. 2d 1345, 1347 (Miss. 1989), which involved a chancery court's order enjoining an intestate's mother from serving as administrator of the estate, the Mississippi Supreme Court held, "Where the appeal is without supersedeas, the successful party may proceed to execute on the lower court decree[.]" Our Court also held in *Ladner*

19

*v. Ladner*, 843 So. 2d 81, 83 (¶5) (Miss. Ct. App. 2003), "Even when an appeal is pending, the appellee may execute on the decree in the lower court, providing the appeal is without a supersedeas bond and that the court does not in any way broaden, amend, modify, vacate, clarify, or rehear the decree." (Citing *McNeil v. Hester*, 753 So. 2d 1057, 1075 (¶68) (Miss. 2000)).

¶38.    Moreover, as the comments to Rule 8 state, "[t]he purpose of a supersedeas bond is to preserve the status quo while protecting the judgment creditor's rights pending appeal." Here, the Appellants withdrew their motion to stay the execution of the order; so there was no reason for the chancery court to require a supersedeas bond. *See Deal v. Wilson*, 922 So. 2d 24, 29 (¶16) (Miss. Ct. App. 2005) (holding that "[a] procurement of a supersedeas bond is the means by which *an unsuccessful litigant seeks a stay of the execution of a judgment appealed from*") (emphasis added). We agree with the Appellants that the requiring of a supersedeas bond under these circumstances was "improper."

¶39.    Further, as counsel for the Appellants argued below, Rule 8 "is absent of any language regarding the posting of a supersedeas bond for attorneys' fees or any other matter." The supreme court has also held, "[I]n cases in which there is 'no contractual provision or statutory authority for attorney fees, they may not be awarded as damages unless punitive damages are also proper.'" *Aqua-Culture Techs. Ltd. v. Holly*, 677 So. 2d 171, 184 (Miss. 1996) (quoting *Greenlee v. Mitchell*, 607 So. 2d 97, 108 (Miss. 1992)). Although Dorothy's attorney is entitled to fees from the estate's proceeds for her work in handling and closing the estate, *see* Miss. Code Ann. § 91-7-299 (Rev. 2018), no statutory authority or contractual

provision has been cited to support a finding that attorney's fees could be recovered from the unsuccessful litigants in this case, either at trial or on appeal.

¶40.    We therefore reverse and render the chancery court's June 10, 2020 order nunc pro tunc requiring each of the Appellants to post a supersedeas bond.[7]

**CONCLUSION**

¶41.    Accordingly, we affirm the chancery court's ruling adjudging Dorothy and Raymond as Lester's only heirs at law but reverse and render the court's order that the Appellants each post a supersedeas bond.

¶42.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**WILSON, P.J., GREENLEE, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, LAWRENCE AND McCARTY, JJ.**

**CARLTON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶43.    I agree with the majority's decision to reverse and render the chancellor's order requiring the Appellants to post a supersedeas bond. However, I disagree with the majority's decision to affirm the chancellor's finding that the Appellants are not Lester's heirs at law. Because Lester failed to take any affirmative action to disestablish the paternity of the Appellants while he was alive, Dorothy cannot now posthumously challenge or disestablish paternity. Therefore, I respectfully concur in part and dissent in part.

¶44.    In reviewing a chancellor's decision on appeal, "[w]e will not disturb the findings of

---

[7] The chancery clerk's docket in the court's record does not reflect that the supersedeas bond was ever posted.

21

a chancellor when supported by substantial evidence unless the chancellor abused his discretion, applied an erroneous legal standard, was manifestly wrong, or was clearly erroneous." *Greer v. Greer*, 312 So. 3d 414, 415 (¶6) (Miss. Ct. App. 2021) (quoting *Williams v. Williams*, 843 So. 2d 720, 722 (¶10) (Miss. 2003)).

¶45.    In this case, the following evidence is undisputed: Lester was married to the Appellants' mother at the time the Appellants were born; Lester was listed as the Appellants' father on their birth certificates; and Lester paid court-ordered child support for the Appellants.  The record shows that Tumika was born in 1974, and Sylvester was born in 1976.  The Appellants turned twenty-one years old in 1995 and 1997, respectively.  During the time that the Appellants were under the age of twenty-one, Mississippi Code Annotated section 93-9-21 (Rev. 1994) provided an avenue for Lester to initiate a paternity action and to request an order requiring blood tests to prove or disprove paternity.  *See Ivy v. Harrington*, 644 So. 2d 1218, 1221 (Miss. 1994).  Section 93-9-21(l) provided, "The court, on its own motion or on motion of the plaintiff or the defendant, shall order the mother, the alleged father and the child or children to submit to blood tests and any other tests which reasonably prove or disprove the probability of paternity."  The record reflects that Lester chose, for whatever reason, not to challenge paternity.  The majority excuses Lester from this burden based upon hearsay testimony from Dorothy stating that Lester's lawyer gave him bad legal advice.

¶46.    The bottom line is that during his lifetime, Lester failed to take the legal steps necessary to challenge paternity or request an order requiring blood tests to prove or disprove

22

paternity, and Dorothy cannot now posthumously challenge or disestablish paternity. The chancellor therefore erred in excluding the Appellants as heirs at law of Lester's estate. Accordingly, I would reverse the chancellor's ruling as to Lester's heirs at law and remand this case for further proceedings consistent with this opinion.

**WESTBROOKS, LAWRENCE AND McCARTY, JJ., JOIN THIS OPINION.**