# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00925-COA

**THE ESTATE OF HAROLD SILVESTER DORSEY, SR., DECEASED, HAROLD S. DORSEY, JR., ADMINISTRATOR**            APPELLANT

v.

**DEREK J. MATORY**            APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/15/2024 |
| TRIAL JUDGE: | HON. J. DEWAYNE THOMAS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | HAROLD SILVESTER DORSEY JR. COOLIDGE CALVIN ANDERSON JR. |
| ATTORNEY FOR APPELLEE: | SAMUEL HUNTLEY WILLIFORD |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 12/09/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND McCARTY, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     The Estate of Harold Dorsey Sr. (Estate) appeals from the Hinds County Chancery Court's July 15, 2024 judgment, finding that: (i) a 1974 petition for adoption and the adoption proceeding, during which Harold Dorsey Sr. was identified as the natural father of Derek Matory, constituted an adjudication of paternity and legitimacy under Mississippi Code Annotated section 91-1-15(3)(b) (Rev. 2021); and (ii) Matory is an heir at law of Harold and entitled to a share of Harold's estate.  For the reasons discussed below, we affirm the judgment.

**Summary of Facts**

¶2.     On February 21, 1964, Matory was born out of wedlock in Jackson, Mississippi, to Miss Spencer Matory and Harold Dorsey Sr. (Harold).[1]  When Matory was ten years old, Spencer gave consent for her parents, Ernest and Mary Matory, to adopt the minor child.[2] The grandparents filed a petition for adoption with the Hinds County Chancery Court on October 30, 1974, noting that they had been caring for the child since birth.  The petition identified Harold as the child's natural father and stated "[t]hat the natural father of said child, Harold Dorsey [Sr.], is not to be found in the State of Mississippi on diligent inquiry and that his place of abode, post office address[,] and street address are unknown to the petitioner after diligent search and inquiry to ascertain same."

¶3.     The chancellor executed a "Fiat" on October 30, commanding the chancery clerk "to cite HAROLD DORSEY to be and appear" before the chancery court at the adoption hearing on December 4, 1974, "to show cause" why the Matorys "should not be the adoptive parents of the minor child."  A non-resident summons for Harold was also published three times in a local newspaper, with the proof of publication being filed with the court.[3]  On December

_____

    [1] Harold was not present in Matory's life, and there is no indication in the record that Harold ever publicly acknowledged Matory as his son.

    [2] Spencer entered a consent for adoption on October 5, 1974.

    [3] The non-resident summons stated:

    TO: Harold Dorsey: Whose post office address and street address is unknown after diligent search and inquiry.  You are summoned to appear before the Chancery Court of the First Judicial District, County of Hinds, in said state, on the 4th day of December, A.D., 1974 to defend the suit No. AD4629 in said Court of Ernest Matory and Mrs. Mary Mageline Matory, Petitioners,

2

4, 1974, the chancery court entered a "Decree for Adoption," which noted that "the natural father of said minor child is properly before this Court after process duly and legally had." The record does not indicate whether Harold or Spencer was actually present at the hearing.

¶4.   Harold died intestate on November 15, 2020. Harold's obituary and funeral program noted, "He leaves to cherish his memory three children with his former wife Annie Ruth Johnson Leslie; Harold Dorsey, Jr., of Jackson[,] MS, Sophia Dorsey King (Alan) of Chicago, IL[,] and Jamilah Dorsey of Chicago[,] IL; [t]wo sons, Chris Smith of St. Louis, MO and **Derek Matory** of Atlanta[,] GA." (Emphasis added).

## Procedural History

¶5.   Almost three years after Harold's death, Harold Dorsey Jr. (Dorsey Jr.) filed a petition for letters of administration with the chancery court on October 16, 2023.[4] Acknowledging Matory as one of the "known adult children" of the decedent, the petition noted that Matory and Chris Smith "were born outside of wedlock and are therefore presumed illegitimates." It was further asserted that Dorsey Jr. was "unaware whether there has been any adjudication of paternity or legitimacy of the Illegitimates before the death of the intestate; and . . . he [was] unaware whether paternity has been judicially established for either Illegitimate after the death of [the decedent]," citing Mississippi Code Annotated section 91-1-15. The

wherein you are the Respondent. This being a Petition for the Adoption of Derek Jancinto Matory, a minor.

[4] Harold owned real property in Hinds County and was buried in Jackson, Mississippi.

chancery court appointed Dorsey Jr. as the administrator of Harold's estate.

¶6.     As administrator, Dorsey Jr. filed a petition to determine heirs on November 27, 2023, which listed only Harold's legitimate children—Dorsey Jr., Sophia, and Jamilah—as Harold's "known heirs at Law." The administrator served Matory through publication, and he contacted Matory directly to get an address in order to forward him a copy of the petition.

¶7.     Matory's attorney filed an entry of appearance and spoke with the administrator, informing him of the 1974 adoption proceedings. Matory filed a response on March 18, 2024, seeking a determination that he is an heir at law of the decedent. Matory argued "that any attempt in the [p]etition to exclude" him as Harold's heir at law is barred by the doctrine of judicial estoppel since the petition for letters of administration had acknowledged him as a known adult child of the decedent. Matory further argued that he is entitled to share in Harold's estate pursuant to Mississippi Code Annotated section 91-1-15(3)(b), which states:

> An illegitimate shall inherit from and through the illegitimate's natural father and his kindred, and the natural father of an illegitimate and his kindred shall inherit from and through the illegitimate according to the statutes of descent and distribution if . . . [t]here has been an adjudication of paternity or legitimacy before the death of the intestate[.]

Miss. Code Ann. § 91-1-15(3)(b). Matory asserted that the 1974 adoption proceeding was "a conclusive and final adjudication of paternity or legitimacy before the death of the intestate, Harold Dorsey [Sr.]."

¶8.     Finally, Matory contended that equity favors a finding that he is an heir at law, noting "that the Administrator waited until the expiration of the one year statute of limitations set

4

forth under [Mississippi Code Annotated section] 91-1-15(3)(c) before opening the estate,

potentially barring Mr. Matory from bringing any claim for inheritance."[5]  He claimed:

> The extended delay in opening the estate was a detriment against Mr. Matory, particularly when the family had previously acknowledged Mr. Matory as a child of the decedent in public through the Obituary and Funeral Program. The Administrator now seeks to bar Mr. Matory from his rights of inheritance because of the very delay caused by the Administrator.

He also asserted the affirmative defenses of collateral estoppel, res judicata, and the doctrine

of unclean hands.

¶9.     On March 28, 2024, the administrator filed a brief in support of the petition to

determine heirs.  The brief asserted that when Dorsey Jr. and Matory were both in college,

---

[5] Mississippi Code Annotated section 91-1-15(3)(c) (Rev. 2021) provides:

An illegitimate shall inherit from and through the illegitimate's natural father . . . according to the statutes of descent and distribution if: . . .

There has been an adjudication of paternity after the death of the intestate, based upon clear and convincing evidence, in an heirship proceeding under Sections 91-1-27 and 91-1-29.  However, no such claim of inheritance shall be recognized *unless the action seeking an adjudication of paternity is filed within one (1) year after the death of the intestate or within ninety (90) days after the first publication of notice to creditors to present their claims, whichever is less*; and such time period shall run notwithstanding the minority of a child.  This one-year limitation shall be self-executing and may not be tolled for any reason, including lack of notice.  If an administrator is appointed for the estate of the intestate and notice to creditors is given, then the limitation period shall be reduced to ninety (90) days after the first publication of notice, if less than one (1) year from the date of the intestate's death; provided actual, written notice is given to all potential illegitimate heirs who could be located with reasonable diligence.

Miss. Code Ann. § 91-1-15(3)(c) (emphasis added).

5

Matory had stopped by the "family house" in Jackson.[6] Dorsey Jr. and Matory "became friends and hung out often that year until Mr. Matory moved to Atlanta Georgia." Despite not talking to Matory again until Harold's funeral, Dorsey Jr. "always stood ready to treat Mr. Matory as a brother though [he] and Mr. Matory never again spoke of this issue." The family included Matory in the funeral program "based on his representations to [Dorsey Jr.] over thirty years earlier — though [the family] truly did not know the basis of his claim."

¶10. The administrator disagreed with Matory's argument that the authenticated adoption records constituted an adjudication of the decedent's paternity of Matory under section 91-1-15(3)(b). The administrator alleged that "on its face, the adoption file/record has several jurisdictional deficiencies for a [p]aternity suit" (e.g., the failure to serve Harold properly and the failure to have either the natural mother or father attend the adoption hearing). Citing section 91-1-15(3)(c), the administrator further asserted in the brief, "If Mr. Matory was interested in establishing the [d]ecedent as his natural father, upon notice that [he] had passed away[,] he could have done so through his [own] efforts by filing a Petition to open the Estate himself and filing his own Petition to Determine Heirs after opening the Estate."

¶11. A hearing was held on April 3, 2024. Although Matory could not recall if Harold ever had publicly acknowledged him as his son, his mother had told him that Harold was his natural father. When Harold died, Matory said his "sister Sophia called [him] and notified

---

[6] According to the petition, "[t]his House is the family house originally purchased by Decedent and his now ex-wife Dr. Annie Ruth Leslie (the Administrator's mother) in 1972."

[him] about the death of our father and invited me to the funeral." When asked why he did not open an estate upon Harold's death, Matory explained, "I'm not an attorney, so it's just not something within my worldview to initiate a legal proceeding, you know, after the passing of someone, so I just never thought about it." Matory was caught off guard when Dorsey Jr. called him about the petition to determine heirs; so he told Dorsey Jr. that he "had no interest in any of this proceeding." However, Matory contacted Dorsey Jr. a few days later to tell him that he had reconsidered.

¶12.    Dorsey Jr., who was an attorney, represented the estate[7] and called his sisters Jamilah and Sophia as witnesses. Jamilah said that the first time she met Matory was at her father's funeral. Jamilah's knowledge of Matory's being her brother was from Dorsey Jr. and Sophia:

> Q. Okay. So what you're stating is that your knowledge of his being your brother is from things that I've told you or Sophia has told you - -
>
> A. My knowledge of it.
>
> Q. - - about our contact?
>
> A. Yeah. My knowledge is from you or Sophia telling me that he's our brother, but I haven't had anything, and even talk with [Matory], I don't - - I didn't know.

Sophia, who drafted Harold's obituary, explained, "I included [Matory's] name because I had heard - - and I told [Matory] this - - that just like him, he was our brother, and although my father never claimed him, I did not see any reason not to include him because I'd heard that"

---

[7] On October 11, 2023, the chancery court granted Dorsey Jr.'s application to be admitted pro hac vice in this case since he is licensed to practice law in Illinois.

from Dorsey Jr. Sophia had "reached out to [Matory] over the years," but he never returned her calls. However, Sophia also said that she did not "have any proof either way" whether Matory was Harold's natural born son.

¶13. After testimony concluded, Matory's attorney asserted that he had "met the requirements of [section] 91-1-15(3)(b)," as "[t]he adoption proceeding was an adjudication of paternity or legitimacy, which occurred well before the death of the intestate." Dorsey Jr. argued that because Matory had not asserted his paternity claim within one year of Harold's death under the provisions of section 91-1-15(3)(c), the chancery court should deny Matory's motion. The chancellor asked both parties to submit proposed findings of fact.

### *July 15, 2024 Final Judgment*

¶14. On July 15, 2024, the chancery court entered its final judgment. The court found that the 1974 adoption proceeding "was both an adjudication of paternity and a legitimacy[,] which each occurred before the death of the intestate," and that Matory is an heir at law of the decedent. The chancery court noted: (1) the petition for adoption identified Harold as Matory's natural father; (2) a non-resident summons "was issued to the decedent" to notify Harold of the adoption proceedings, and a fiat was executed requiring Harold to appear before the court; and (3) it was stated in the adoption decree that the natural father "is properly before this Court after process duly and legally had." The chancery court thereby concluded that the identification of the decedent as the natural father in the adoption proceeding "meets the requirements of both (1) a 'judicial proceeding' and (2) 'judicial

8

authority,' as defined by our Courts, and clearly establishes that the decedent was deemed to be the natural father of Mr. Matory 'before the death of the intestate,'" which "compl[ies] with the terms and conditions as set forth under Miss. Code Ann. § 91-1-15(3)(b)."

¶15.    Citing *Hogan v. Buckingham*, 730 So. 2d 15 (Miss. 1998), the chancery court also held that res judicata and collateral estoppel prohibited the administrator "from re-trying the issue of paternity by questioning the 1974 adoption proceeding.[8]    The chancery court specifically noted the supreme court's conclusion in *Hogan*, "While the equities of the present circumstances are less than gratifying, the language of § 91-1-15(3)(b) makes clear that an illegitimate inherits from the kindred of his natural father where, as in the present case, there has been a prior adjudication of paternity." *Id*. at 20 (¶21).  Here, the chancery court likewise found that "even if the Administrator finds the facts of the 1974 adoption proceeding less than gratifying," . . . this [c]ourt cannot overturn the Decree for Adoption[.]" Therefore, the court found that "[t]he Administrator's argument regarding the application of the paternity statutes under [Mississippi Code Annotated section] 93-9-9 (as amended)[,] and

---

[8] In *Hogan*, which involved the wrongful death of an illegitimate child, the decedent's mother sought DNA testing to confirm whether two other illegitimate children by the decedent's natural father, Jerry Quinn, were heirs and entitled to share in the decedent's estate. *Id*. at 16-17 (¶¶2-5).  Because there had been prior default paternity orders against Quinn for the step-siblings, with no blood or DNA testing performed, the trial court "ruled that both matters were res judicata and that [the mother] lacked standing to challenge these prior orders of paternity." *Id*. at 17 (¶5).  The *Hogan* Court affirmed the judgment, holding that the court "did not err in denying the blood and DNA tests, since the defendants had already been determined to be the heirs at law of [the decedent] as a matter of law." *Id*. at 20 (¶21).

9

his attempts to merge them into a proceeding concluded almost fifty years ago[,] is not well taken."[9]  Since Matory met the requirements of subsection (3)(b), the court concluded that the provisions of subsection (3)(c) of the statute (adjudication of paternity after death of putative father) are not applicable in this case, as argued by the administrator.

¶16.    The chancery court alternatively held that equity favored a finding that Matory is an heir at law, noting that the obituary had listed Matory as Harold's son and that the sworn, notarized petition for letters of administration had "affirmatively identified Mr. Matory as a known child of the decedent."  The court thus rejected the administrator's attempt to invoke the one-year time limitation from section 91-1-15(3)(c) to prevent Matory from asserting paternity, particularly noting the administrator's delay in the opening of the estate.

¶17.    On behalf of the Estate, the administrator appeals the chancery court's judgment, arguing that the chancery court erred in (i) finding the adoption proceeding was res judicata as to the issue of Matory's paternity; and (ii) finding that equity demands that the one-year time bar in section 91-1-15(3)(c) does not apply against Matory.[10]

**Standard of Review**

---

[9] Claiming the adoption proceeding "had several jurisdictional deficiencies for a [p]aternity suit," the administrator had argued in the brief that standing in paternity actions is limited "to the natural mother, natural father, the child or any public authority chargeable by law with the support of the child," not the grandparents, citing Mississippi Code Annotated section 93-9-9 (Rev. 1994).

[10] We have reordered the issues in the Estate's brief to address first the issue of whether there had been a prior adjudication of paternity, as that ruling was dispositive to the chancellor's finding that Matory is an heir at law.

¶18. Our Court applies "a limited standard of review" to appeals from a chancery court's ruling. *In re Jones ex rel. Taylor*, 411 So. 3d 1169, 1173 (¶20) (Miss. Ct. App. 2025). We "must defer to a chancery court's findings of fact unless they are manifestly wrong or clearly erroneous." *Scott v. Anderson-Tully Co.*, 154 So. 3d 910, 915 (¶13) (Miss. Ct. App. 2015) (quoting *Double J Farmlands Inc. v. Paradise Baptist Church*, 999 So. 2d 826, 829 (¶13) (Miss. 2008)). "Whenever there is substantial evidence in the record to support the chancellor's findings of fact, those finding[s] must be affirmed." *Id.* (quoting *Bank of Miss. v. Hollingsworth*, 609 So. 2d 422, 424 (Miss. 1992)). Conclusions of law, however, are reviewed de novo. *Est. of Burford v. Freeman*, 281 So. 3d 942, 946 (¶8) (Miss. Ct. App. 2019) (quoting *Ainsworth v. Ainsworth*, 139 So. 3d 761, 762 (¶3) (Miss. Ct. App. 2014)).

**Discussion**

I.      **Whether the chancery court erred by finding the 1974 adoption proceeding was res judicata as to the issue of paternity.**

¶19. The Estate contends that the chancery court's holding that the petition for adoption sufficed as an adjudication of the decedent's paternity "is an inaccurate reading of relevant statutes and case law and that [Matory's] adoption fails several jurisdictional requirements of a Petition to Adjudicate Paternity or Legitimacy and fails pursuant to the plain language of [section] 91-1-15(3)(b)." The Estate argues:

> [B]eing given notice and an opportunity to contest an [a]doption [p]roceeding . . . is not the same as giving notice of an [a]djudication of [p]aternity or [l]egitimacy [p]roceeding. To adjudicate either requires notice of the particular proceeding and an opportunity to contest in order to establish procedural due process.

11

Thus, the Estate claims that the 1974 adoption decree made no decision as to Matory's paternity or legitimacy.

¶20.     First, the chancery court thoroughly addressed the administrator's allegations that the adoption proceeding had some "jurisdictional deficiencies" (e.g., lack of service of process and lack of notice given to Harold). As cited by the chancery court, the supreme court in *Hogan* affirmed a trial court's ruling that prior adjudications of paternity were res judicata to the issue of the step-siblings' status as heirs of the decedent. *See Hogan*, 730 So. 2d at 20 (¶¶21-22). While we acknowledge the distinguishable facts in *Hogan* (i.e., that it involved a paternity adjudication and not an adoption), we nevertheless agree with the chancery court's reasoning that the Estate does not have standing to now challenge that 1974 adoption proceeding on any procedural or jurisdictional grounds.

¶21.     With regard to the Estate's claim that notice was deficient, the former version of Mississippi Code Annotated section 93-17-5 (1972), which concerns consent for adoption and was in effect at the time of the adoption proceeding, expressly provided: "In the case of a child born out of wedlock, the father shall not be deemed to be a parent for the purposes of this chapter, and no reference shall be made to the illegitimacy of such child." The Mississippi Supreme Court stated that "[t]he effect of this provision is that the putative father of a child does not have to be notified of an adoption proceeding." *Smith v. Malouf*, 722 So. 2d 490, 494 (¶13) (Miss. 1998). In *Malouf*, 722 So. 2d at 497 (¶30), the supreme court determined that this provision "cannot stand up to constitutional scrutiny" and held that a

12

putative father "had a constitutional right to be notified of or to withhold his consent to the adoption of his child[.]"[11]

¶22.    In this case, the 1974 petition for adoption expressly identified Harold as Matory's natural father, and Harold was given notice (both by fiat and publication) of the judicial proceeding.  The chancery court then made a factual finding in the decree of adoption that "the natural father of said minor child is properly before this Court after process duly and legally had."  We therefore agree with the chancery court's reasoning in this case that the effect of this identification, notice, and inclusion in the chancery court's 1974 adoption proceeding, as indicated in the adoption records, "is a conclusive and final adjudication of paternity or legitimacy before the death of the intestate" decedent under section 91-1-15(3)(b).

¶23.    Although the Estate notes that no separate petition for paternity was filed with the court in this case, section 91-1-15(3)(b) does not specify how an "adjudication of paternity or legitimacy" is to be established.  As the chancery court discussed in its judgment, our Court has noted that the term "[a]djudicate" means "to settle in the exercise of judicial authority."  *Prout v. Williams*, 55 So. 3d 195, 199 (¶12) (Miss. Ct. App. 2011) (quoting Black's Law Dictionary 42 (6th ed. 1990)).  In *Prout*, we held that a "Delayed Certificate of Birth" before a decedent's death, while an "acknowledgment of possible paternity," was

---

[11] This provision from the statute was subsequently removed by amendment.  *See* 2016 Miss. Laws ch. 431, § 19 (H.B. 1240); 2002 Miss. Laws ch. 533, § 1 (S.B. 2750).

13

"insufficient under section 91-1-15(3) because *the paternity was never adjudicated by a court of law*, let alone within the appropriate time limits." *Prout*, 55 So. 3d at 200 (¶13) (emphasis added). Unlike *Prout*, the present case involved a judicial proceeding before the chancery court—a judicial proceeding that had a legal effect on Harold's rights as a natural father, as it terminated his parental rights and his right to inherit through Matory.[12]

¶24. Lastly, we find our holding in *Smith v. Bell*, 876 So. 2d 1087 (Miss. Ct. App. 2004), supportive of the court's decision. In that case, we affirmed a chancery court's ruling that the illegitimate son of decedent Francis Bell Jr. had proved "beyond clear and convincing evidence" that he was an heir, despite the fact that another man (James Ross) was named as Francis Bell III's father on his birth certificate. *Id*. at 1090 (¶10). We agreed with the chancery court that the evidence—testimony by Francis, his mother, two of Francis's sisters, school and military records listing Bell Jr. as Francis's father, and Bell Jr.'s obituary naming Francis "as a survivor" of the decedent—"provide[d] a substantial basis upon which the chancellor could have based his decision." *Id*. at 1091 (¶¶15-16).[13]

---

[12] Mississippi Code Annotated section 93-17-13 (1972) provided (and still provides) that a final decree of adoption adjudicates "that the natural parents and natural kindred of the child shall not inherit by or through the child . . . and all parental rights of the natural parent, or parents, shall be terminated."

[13] Our Court also rejected the appellant's assertion that paternity testing should be required "in order to provide a means for the trial court to meet its burden." *Smith*, 1087 So. 2d at 1091 (¶16), explaining:

The case at bar deals with the rights of illegitimate children under [s]ection 91-1-15(3)(c). The Appellants are unable to cite, and we are unable to find, any case in which [Mississippi Code Annotated s]ection 93-9-21(1) has been

14

¶25. Although *Smith* concerned an adjudication of paternity under section 91-1-15(3)(c), we find the basis for its holding supports the court's ruling on this issue as well. As in *Smith*, the evidence at the hearing in the present case (i.e., the petition for adoption listing Harold as the natural father; the court-issued fiat and summons for Harold; the adoption decree; testimony by the witnesses; and Harold's obituary (listing Matory as a survivor) provided a substantial basis for the chancery court's determination that there had been a prior adjudication of paternity as required by section 91-1-15(3)(b).

¶26. Accordingly, finding that the chancery court did not manifestly err in its ruling on this issue, we affirm the judgment finding Matory to be an heir at law of Harold.

**II.** **Whether the chancery court erred in finding equity demands that the one-year limitation from section 91-1-15(3)(c) is not applicable against Matory.**

¶27. Although the chancery court's finding that Matory satisfied the requirement under subsection (b) was dispositive to the heirship issue, the court alternatively addressed the Estate's contention that Matory was time-barred from asserting his claim under subsection (3)(c) of section 91-1-15. The court held:

> The Administrator is required to act in the best interest of all Heirs-at-Law. The extended delay in opening the estate was a detriment against Mr. Matory,

---

> applied to a case of descent and distribution. There is no applicable statutory provision or judicial decision mandating or even suggesting the necessity of blood testing or DNA evidence in cases of descent among illegitimates.

*Id*. at 1091-92 (¶16) (quoting *Jordan v. Baggett*, 791 So. 2d 308, 311 (¶15) (Miss. Ct. App. 2001)).

particularly when the family had previously acknowledged Mr. Matory as a child of the decedent in public through the Obituary and Funeral Program. The Administrator now seeks to bar Mr. Matory from his rights of inheritance because of the very delay caused by the Administrator. "Simply put, this means that no person as a complaining party can have the aid of a court of equity when his conduct with respect to the matter has been characterized by willful inequity." [James W. Shelson, *Mississippi Chancery Practice* § 2:27, at 52 (2003)].

. . . .

Because of the Administrator's delay in opening the estate, he now wants to use such expiration of that time period against Mr. Matory. Equity does not favor such actions to the detriment of Mr. Matory.

The Estate contends on appeal that the court's blaming Dorsey Jr. for not filing a petition to open the estate sooner "is misplaced and is an erroneous manifest misinterpretation of [Mississippi] law on standing and the [f]iduciary duty of an Administrator." The Estate asserts that Matory bore the burden of bringing the paternity adjudication hearing and filing the petition to open the estate and determine heirs within the one-year limitation imposed in section 91-1-15(3)(c).

¶28. We determine that the evidence supports the chancery court's decision that equity favors a finding that the time limitations in 91-1-15(3)(c) were inapplicable in this particular instance. "One of the procedural maxims of equity is that equity looks to the intent, and will regard substance rather than form." *Nunnery v. Nunnery*, 195 So. 3d 747, 753 (¶17) (Miss. 2016) (quoting *Kemp v. Atlas Fertilizer & Chem. Co.*, 199 So. 2d 52, 57 (Miss. 1967)). The chancery court determined that the public acknowledgment by Harold's legitimate children and by the administrator (i.e., listing Matory as Harold's son in the funeral program and

16

obituary) within the one-year limitation set forth in section 91-1-15(3)(c) was "a clear indication that Mr. Matory is a known illegitimate child of the decedent."

¶29.    The supreme court has held that "in the absence of fraud or mistake, an administratrix . . . may not take inconsistent positions which could be detrimental to beneficiaries, on the one hand, and beneficial to herself on the other hand." *In re Est. of Johnson*, 705 So. 2d 819, 823 (¶30) (Miss. 1996) (citing *Est. of Ratliff*, 395 So. 2d 956, 957 (Miss. 1981)). In *Johnson*, after a former administratrix "took a position in the estate of Robert L. Johnson which was beneficial to herself and detrimental to Claud," the decedent's illegitimate child, the supreme court concluded:

> Her failure to act to properly open the estate in 1982, while she was acting as *administratrix de son tort*, operates as a waiver of the statutory bar against Claud. Our Mississippi courts have long followed the maxim of equity that no person bound to act for another can act for herself. From 1974, until the [c]hancellor removed Ms. Anderson as administratrix in 1991, Mrs. Thompson and Ms. Anderson were under a duty to act for the rightful heirs of Robert L. Johnson, not for themselves. Thus, under these facts, equity will waive the statutory bar of Section 91-1-15 and open the window to the extent that Claud shall be allowed to prosecute his claim to be the illegitimate son of Robert L. Johnson, deceased, to the same extent as though he had filed his claim between July 1, 1981, and July 1, 1984.

*Id*. at (¶36).

¶30.    Furthermore, "the mandatory compliance by an illegitimate with the provisions of Miss. Code Ann. § 91-1-15(3)(c) presupposes a good faith compliance by the administrator with the obligation imposed upon him by law to advise the court and secure process upon all heirs known to him." *Leflore ex rel. Primer v. Coleman*, 521 So. 2d 863, 868 (Miss. 1988)

17

(citing Miss. Code Ann. §§ 91-7-293 & 91-1-29). Respectively, in *Estate of Flowers*, 493 So. 2d 950 (Miss. 1986), and *Estate of King*, 501 So. 2d 1120 (Miss. 1987), the supreme court determined that the time requirements in section 91-1-15(3)(c) were not applicable in a case of a deliberate failure to notify the potential heirs, as required by Mississippi Code Annotated section 91-1-27, or in a case of a deliberate concealment from the chancery court of the names of potential heirs required to be named under Mississippi Code Annotated section 91-7-293.

¶31. Here, as Matory discusses in his brief, "[i]n addition to the public acknowledgments through the Obituary and Funeral Program identifying Mr. Matory as a child of the decedent, [Dorsey Jr.] acknowledged Mr. Matory as a natural child of the decedent through his own sworn pleadings as filed with the trial court" filed almost three years after the decedent's death. The chancery court reasoned that because of this public recognition by the administrator and the rest of the family that Matory was Harold's natural child, "there was no reason for Mr. Matory to ever question whether he would be included as an heir." Yet, despite these acknowledgments, the administrator's petition to determine heirs excluded Matory as a known heir at law, and the administrator argued before the court that Matory is time-barred from asserting his claim as an heir. We agree with the court that equity "does not favor" the administrator's now using "such expiration of that time period" in section 91-1-15(3)(c) against Matory.

¶32. Accordingly, we affirm the chancery court's judgment finding that Matory is Harold's

natural child and his heir at law and that Matory "met the requirements of" section 91-1-15(3)(b).

¶33. **AFFIRMED.**

**CARLTON, P.J., McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD AND McCARTY, JJ.**

**WESTBROOKS, J., SPECIALLY CONCURRING:**

¶34. I write separately to express my continued concerns with Mississippi Code Annotated section 91-1-15(3) (Rev. 2021). The controlling statute cited by the majority contains harmful language citing natural nonmarital children as "illegitimate." I agree with the majority's finding that Matory met the requirements outlined in section 91-1-15(3); however, as I recently wrote in a similar case, *Curry v. Thomas (In re Est. of Lewis)*, No. 2024-CA-00925-COA, 2025 WL 2836973, at *8 (¶¶38-40) (Miss. Ct. App. 2025) (Westbrooks, J., specially concurring), the term "illegitimate" is harmful and carries a negative connotation. Referring to children as "illegitimate" is derogatory, and the term "has plagued our society for years, often carrying caste-like undertones that lead to the unequal treatment of children who are not responsible for the circumstances of their births. The terminology is outdated, offensive, and fails to recognize the modernization of society." *Id.* at (¶39). Utilizing this derogatory term in our statutes continues to promote stigmas surrounding single parents or nonmarried

19

parents. I urge the Legislature to adopt more inclusive language as other states have done.[14]

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**

---

[14] *See* Ariz. Rev. Stat. Ann. § 14-2114 (2025) (using the term "natural child"); Ga. Code Ann. § 53-2-3 (2025) (using the term "child out of wedlock"); N.Y. Est. Powers & Trusts Law § 4-1.2 (McKinney) (2021) (using the term "non-marital child"); Tex. Est. Code Ann. § 201.052 (2015) (using the term "biological child"); W. Va. Code Ann. § 42-1-5 (2001) (using the term "non-marital child").